796 So.2d 135 (2001)
STATE of Louisiana, Appellee,
v.
Ronnie O. DORSEY, Sr., Appellant.
No. 34,977-KA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 2001.
*137 Carey J. Ellis, III, Rayville, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry Jones, District Attorney, Geary S. Aycock, Assistant District Attorney, Counsel for Appellee.
Before BROWN, GASKINS and DREW, JJ.
BROWN, Judge.
A jury found defendant, Ronnie O. Dorsey, Sr., guilty of the second degree murder of his estranged wife, Vicky Dorsey. Thereafter, defendant was sentenced to life imprisonment. Defendant has appealed his conviction. Finding no error, however, we affirm.

Facts
The body of defendant's estranged wife, Vicky Dorsey, was never found. Defendant and Vicky, who had been married for several years, had an "on again, off again" relationship and had been separated since July 1999. On August 7, 1999, Vicky went to the Tropical Lounge in Monroe, Louisiana; she left the bar around 1:00 a.m. the next morning. Business was slow that night at the Tropical Lounge; Vicky was the last patron in the bar and left after several hours spent conversing with the employees. Since leaving the lounge, *138 Vicky has not been seen, nor have friends or relatives, including her children, heard from her.
A few minutes after Vicky's departure, two employees went outside to clean the parking lot. They saw Vicky's car and two purses, one with blood on it, with their contents scattered on the ground. Other employees were called out to the parking lot. They observed more blood and the shoes of the victim in an alley. At that time, the Monroe Police Department was called.
When the officers arrived, they immediately secured the area. One officer found a nail in one of Vicky's car tires, which he collected as evidence. Officers also found two large pools of blood in the Texaco parking lot next to the Tropical Lounge. The size of one of the pools of blood was approximately three feet by twelve to eighteen inches. The other pool of blood was approximately twelve inches by eighteen inches in size. There was also a .380 caliber seven-round magazine clip lying in one of the pools of blood. The clip contained six live rounds. The police officers followed a blood trail to an alley and found a pair of drag marks; they also discovered Vicky's shoes.
Officers went to defendant's brother's home. While the officers were talking to one of defendant's brothers, defendant and his brother Alvis pulled into the driveway in defendant's green Ford Explorer. The officers noticed fresh blood on the rear bumper of defendant's vehicle and arrested him.
Search warrants for defendant's sports utility vehicle and home were obtained. In the truck, blood was found on the driver's arm rest, the passenger side door and window, the rear window and a pair of blue shorts. At the house, blood was found on a comforter, a wall near a light switch, a wristwatch, a tube of toothpaste, a soap dish, a Northwest Territory shirt, a black pair of tuxedo pants and a towel in a box which had been thrown on top of the roof of a shed in the back yard. Also found were a .380 caliber bullet in the black tuxedo pants and a box of .380 caliber ammunition on top of a television set.
On August 18, 1999, defendant was indicted for the first degree murder of Vicky Dorsey. Subsequently, the charge was amended to second degree murder. Following trial, the 12 member jury rendered a unanimous verdict of guilty. Defendant's motions for new trial and post-verdict judgment of acquittal were denied and this appeal ensued.

Discussion

Sufficiency of the Evidence
Defendant argues that the evidence was insufficient to support his conviction of second degree murder. Specifically, defendant contends that, without a victim, there was no evidence of a death or crime.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, *139 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
La.R.S. 14:30.1(A) provides in part that second degree murder is the killing of a human being:
(1) when the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) when the offender is engaged in the perpetration or attempted perpetration of ... second degree kidnapping... even though he has no intent to kill or to inflict great bodily harm.
The state is not limited to direct evidence to prove the elements of a crime. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Thompson, 33,058 (La.App. 2d Cir.04/07/00), 758 So.2d 972. When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982).
In other words, the facts established by the direct evidence and inferred from the circumstances must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); Thompson, supra; State v. Owens, 30,903 (La.App. 2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
Specific intent necessarily must be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988).
Because her body was not found and no one witnessed her death, there was no direct evidence that Vicky Dorsey was killed. There was ample circumstantial evidence, however, from which the jury could infer that Vicky had been killed by defendant.
Vicky had been hired by the U.S. Postal Service and had arranged with her former employer, St. Francis Hospital, to fill in as an R.C.A. (registered care attendant) when her schedule with the post office allowed. Her employers both testified that Vicky was a good employee who reported to work regularly and timely prior to her disappearance. All witnesses, including Vicky's children and members of her rather large extended family, testified that they have not heard from or seen Vicky since August 8, 1999.
There were two large pools of blood found in the Texaco parking lot, one of which contained the clip from a .380 caliber pistol. A .380 caliber bullet was found in a bloodstained pair of tuxedo pants belonging to defendant and a box of .380 caliber bullets was found on his television set. There was also blood found on and in defendant's vehicle as well as on numerous items in defendant's home.
Judith Floyd, a forensic laboratory supervisor at Gene Screen in Dallas, Texas, was qualified as an expert in DNA testing. According to Ms. Floyd, there was a 99.99% chance that the blood on the above *140 mentioned items was the blood of Vicky Dorsey. Ms. Floyd determined Vicky's DNA by performing a reverse parentage screen, i.e., she conducted DNA tests on defendant and Vicky's children. Ms. Floyd estimated that the percentage of such a profile occurring in the black population was one in 190 million.
Dr. Teri O'Neil, the Medical Director for Emergency Medical Services in Northeast Louisiana and the coroner in Ouachita Parish, provided expert testimony in medical trauma and the determination of blood loss. According to Dr. O'Neil, the amount of blood that was found during the course of the investigation was approximately 43% of Vicky's total blood volume. Such an amount of blood loss would cause a person to experience a "class four" hemorrhage, which is severe and life threatening. In fact, a person with such a loss would be in danger of dying without immediate aggressive resuscitation measures. Dr. O'Neil testified that no patient fitting Vicky's description was admitted to area hospitals on or around August 8, 2000.
Defendant's expert, Edward Elliot Hueske, was qualified as a crime scene reconstruction expert and was called to rebut the testimony of Dr. O'Neil. Hueske testified at trial that he did not think that Dr. O'Neil's calculation was reliable and that Dr. O'Neil did not follow accepted procedures that are used in the forensic science community.[1] Hueske, however, stated that anyone who took geometry could calculate volumes based on dimensions. He further testified that one of Dr. O'Neil's procedures, the rectangular measurement method, was correct. More importantly, however, was that Hueske did not opine that there was less blood than the amount estimated by Dr. O'Neil, nor did he offer any testimony that Dr. O'Neil's methodology was not accepted in the medical community.
The state produced additional evidence that placed defendant at the crime scene. Rodean Walker testified that she lived less than one mile from the Tropical Lounge. On August 8, 1999, around 12:30 a.m., defendant went to Ms. Walker's house and asked her for a nail. She gave him the nail and she watched him drive toward the Tropical Lounge. Ms. Walker identified that nail found in Vicky's tire as similar to the one she gave defendant that night.
The evidence also revealed a long and violent (dating, then) marital history between defendant and the victim. Vicky's mother testified that her daughter showed her numerous bruises that resulted from physical altercations with defendant. There was also testimony regarding numerous occasions on which the police were called to the Dorsey home in response to Mrs. Dorsey's reports of domestic violence. Several officers testified that they observed bruises and other marks on the victim during these calls. On one such occasion the officers had to use pepper spray to subdue defendant. In July 1999, Vicky obtained a protective order; in support of her request, she testified that defendant had beat her and put a gun to her head.
Patrice Foy, Vicky's son from a previous relationship, testified that defendant was angry just before Vicky's disappearance and that he questioned Patrice about some audiotapes that Vicky had allegedly given to him. While defendant was interrogating Patrice, the victim's son observed a black, .380 caliber semi-automatic pistol in defendant's vehicle. Defendant's neighbor *141 also testified that he had seen defendant with a .380 caliber pistol. As noted above, a .380 caliber magazine clip with six live rounds was found in one of the pools of blood at the crime scene. The clip was a seven round clip. If fully loaded, with one round in the chamber, the clip would have two rounds missing.
Vicky's supervisor from St. Francis hospital testified that on February 26, 1999, defendant told her that he would harm Mary Owens, a nurse (and Vicky's co-worker) at the hospital unless she "backed off." Defendant was angry because Ms. Owens had picked Vicky up from the Dorsey home one night and allowed her to change clothes at her home before giving the victim a ride to work. Based on that incident, defendant accused Ms. Owens and Vicky of having a lesbian relationship. In addition to voicing threats to the victim's supervisor, defendant called and threatened Ms. Owens.
During defendant's testimony, he was unable to give an explanation for the blood that was found at the scene, in and on his vehicle and on numerous items in his home.
Clearly, the evidence was sufficient for a rational jury to conclude that Vicky Dorsey was killed by defendant who specifically intended to kill or inflict great bodily harm or while in the course of the perpetration or attempted perpetration of second degree kidnapping. This assignment of error is without merit.

Expert Testimony of Dr. O'Neil
According to defendant, the trial court erred in allowing Dr. O'Neil to be qualified as an expert in estimating the blood loss; specifically, defendant contends that the trial court erred in allowing Dr. O'Neil to testify as to the amount of blood lost and its effect on the victim's ability to survive such a loss. According to defendant, the method of estimating blood volume used by Dr. O'Neil is not scientifically reliable. On the other hand, defense counsel did not contest Dr. O'Neil's expertise as a medical doctor. In her more than 16 years of practice, Dr. O'Neil testified that she has estimated the blood loss of hundreds of patients.
Courts are charged with a "gatekeeping" function to ensure that unnecessary and prejudicial emphasis is not placed on expert testimony when that testimony could result in an unjust verdict. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Quatrevingt, 93-1644 (La.02/28/96), 670 So.2d 197, cert. denied sub nom, Quatrevingt v. Louisiana, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996); State v. Foret, 628 So.2d 1116 (La. 1993).
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise. La.C.E. art. 702. Trial judges are required to consider factors other than whether the purported expert's testimony is based on methodology subject to "general acceptance" in the scientific community, which allows the admission of some testimony even if the methodology is not "generally accepted." In the Interest of W.T.B., 34,269 (La.App. 2d Cir.10/20/00), 771 So.2d 807. The proponent of expert testimony cannot simply elicit the expert's conclusionary testimony, but must elaborate to some extent about the methodology employed to verify the hypothesis. In the Interest of W.T.B.; Clement v. Griffin, 91-1664 (La.App. 4th Cir.03/03/94), 634 So.2d 412, writ denied, 94-0717 (La.05/20/94), 637 So.2d 478.
*142 Dr. O'Neil was qualified as an expert at a motion in limine hearing. Dr. O'Neil is a medical doctor and the coroner of Ouachita Parish. She testified that she has estimated blood loss of patients hundreds of time in accordance with methods taught in medical school.
In this case, the trial court concluded that the tests conducted by Dr. O'Neil were scientific tests. As opposed to State v. Schmidt, 97-249 (La.App. 3d Cir.07/29/97), 699 So.2d 448, writ denied, 97-2220 (La.12/19/97), 706 So.2d 451, in which the tests involved the comparison of HIV in two different people, in the instant case, the experiment involved geometric calculations of dimension and estimations based on the witness's training and experience as a medical doctor. In fact, defendant's expert witness conceded that anyone who had taken high school geometry could figure out volumes based on dimensions.
The qualification of an expert witness rests within the sound discretion of the trial court and its determination will not be disturbed absent manifest error. Generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect on the weight to be given such testimony, not to its admissibility. Hunter v. Bossier Medical Center, 31,026 (La.App. 2d Cir.09/25/98), 718 So.2d 636; Tyler v. Richardson, 476 So.2d 899 (La. App. 2d Cir.1985), writ denied, 478 So.2d 907 (La.1985); Chatelain v. U.S. Fidelity & Guaranty Co., 495 So.2d 379 (La.App. 3d Cir.1986), writ denied, 498 So.2d 756 (La.1986).
Based upon Dr. O'Neil's experience and education in determining blood loss, we find no error in the trial court's decision to allow Dr. O'Neil to testify as an expert concerning the amount of the victim's blood loss.

Selection of Grand Jury Foreperson
Defendant was convicted on January 22, 2000. He did not file a motion to quash the grand jury indictment until March 9, 2000. On appeal, defendant argues that the trial court should have granted his motion to quash the grand jury indictment. According to defendant, the exclusion of black grand jury forepersons violated his constitutional rights to due process and equal protection.
All objections arising from the selection of grand jury forepersons are treated as an allegation of discriminatory selection of grand jurors. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state's procedural requirements. Deloch v. Whitley, 96-1901 (La.11/22/96), 684 So.2d 349. However, an equal protection claim that is not asserted in a pre-trial motion to quash is waived. State v. Robinson, 32,794 (La.App. 2d Cir.03/01/00), 754 So.2d 311, writ denied, 00-0989 (La.03/23/01), 787 So.2d 1008.
As noted above, defendant did not assert his claim in a timely manner, but filed the motion more than a month after he was convicted. The trial court did not err in denying defendant's motion.

Capacity/Competency of Defendant
In this assignment of error, defendant argues that a contradictory hearing should have been conducted when he raised the issue of his mental incapacity to proceed. Defendant raised this issue on two occasions. The first was during trial and the second was post-trial. Hearings were held both times.
Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings *143 against him or to assist in his defense. La.C.Cr.P. art. 641. The trial court has great discretion in ruling on a determination of competency and its decision will not be overturned on appeal absent an abuse of this vast discretion. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
The Louisiana Supreme Court has enunciated several factors in determining whether a defendant is competent to proceed:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and, whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
State v. Castleberry, 98-1388 (La.04/13/99), 758 So.2d 749, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); State v. Bennett, 345 So.2d 1129 (La.1977).
The mere fact that a defendant's capacity to proceed is called into question by formal motion does not for that reason alone require the trial court to order a mental examination. La.C.Cr.P. art. 643; State v. Lott, 574 So.2d 417 (La.App. 2d Cir.1991), writ denied, 580 So.2d 666 (La. 1991). Because there is a presumption of sanity, before the trial judge is required to appoint a sanity commission, the defendant bears the burden of showing by a preponderance of the evidence that reasonable grounds exist to doubt his mental capacity to proceed. State v. McBroom, 27,027 (La. App. 2d Cir.05/10/95), 655 So.2d 705.
A trial court may consider expert testimony on defendant's present mental incapacity to proceed, but the ultimate decision on competency shall be made by the court alone. In this case, the trial court determined that defendant had the capacity to proceed both times the issue was raised.
At the first hearing, defendant gave vague testimony about a report that he filled out at a doctor's office in 1988. Defendant stated that he currently had trouble sleeping. When asked if he imagined seeing people, defendant's reply was "no." The trial court asked defendant whether he understood what he was being charged with and how long he had been incarcerated. Defendant responded, "yes." Defendant also admitted that he was cooperative with his attorney and that he had the mental capacity to proceed.
Defendant further testified that he was hospitalized for stress due to problems at home. He also stated that he had a cyst removed from the back of his head several years ago. He related a story, in *144 detail, that his brother told him about his inability to rouse defendant while his wife was having sex with another man in their home while he was asleep in the bedroom. Defendant then said that his wife, the victim, visited him in jail on two separate occasions.
Next, defendant's mother and two of his sisters testified that, in their opinions, defendant lacked the capacity to proceed, even though they offered no specific evidence in support of their conclusion. The record, however, does not show that the mother and sisters are even remotely qualified to determine a person's mental capacity.
The trial court found that it had no reasonable ground to doubt defendant's mental capacity to proceed and that defendant did not overcome the presumption that he had the capacity to proceed.
On March 6, 2000, a hearing on defendant's second motion to raise the issue of his present capacity to proceed was held. Defense counsel was granted a continuance until he could obtain defendant's medical records, which he claimed would show defendant's present mental incapacity. After counsel obtained the records, the hearing resumed on March 16, 2000. Defense counsel conceded that the records did not show anything and the trial court denied the motion.
Defendant next claims that the trial court erred in not determining his sanity at the time of the offense. Defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La.C.Cr.P. art. 652. Insanity is an affirmative defense which must be pled. To avail oneself of the insanity defense, a defendant must plead not guilty and not guilty by reason of insanity and must show that he was unable to distinguish between right and wrong when the offense was committed. State v. Hurst, 606 So.2d 965 (La.App. 3d Cir.1992).
In this case, defendant pled not guilty only and thus waived the defense of insanity. When defense counsel made his motion for lack of present mental capacity, he specifically stated, "this is not an insanity plea." This assignment of error is without merit.

Amended Bill of Indictment
A review of the amended bill of indictment shows that it was not signed by the foreperson of the grand jury nor was it endorsed as "a true bill." The jurisprudence is clear that a district attorney can amend a bill of indictment to a lesser, responsive charge, unless there is a showing of prejudice to the defendant. This includes, as in this case, a reduction of a bill of indictment from first degree murder to second degree murder. State v. Offord, 95-390 (La.App. 3d Cir.10/04/95), 663 So.2d 296.

Sentencing
Defendant was tried on the amended charge of second degree murder. The hearing transcript shows that defendant was sentenced on the second degree murder charge on April 26, 2000, to life imprisonment without benefit. The court minutes reflect a heading of "First Degree Murder," but the minutes themselves show that defendant was in fact sentenced for second degree murder. After sentencing, on May 11, 2000, the trial court filed a "Sentencing Order" which shows that defendant was sentenced for first degree murder. Because this error has the potential to cause prejudice to defendant, we will order the trial court to file an amended judgment to reflect that defendant was sentenced for second degree murder and the clerk to make note of same in the minutes.

*145 Conclusion

For the reasons set forth above, the trial court is instructed to amend the judgment to reflect that defendant was sentenced for second degree murder. In all other respects, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Hueske did not become involved in the case until the day before trial. In fact, without examining any evidence, he agreed to testify for the defense, for a fee. Hueske did not go to the crime scene nor did he look at any of the bloodstained fabrics.