441 So.2d 707 (1983)
STATE of Louisiana
v.
James FLOWERS.
No. 82-KA-2621.
Supreme Court of Louisiana.
September 2, 1983.
*710 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., William Credo, Philip Boudousque, Louise S. Korns, Asst. Dist. Attys., for plaintiff-appellee.
Martha E. Sassone, Staff Appeals Counsel, Gretna, for defendant-appellant.
DENNIS, Justice.
Defendant, James Flowers, was convicted by a jury of first degree murder and sentenced to death upon the jury's unanimous recommendation following a sentencing hearing. In this appeal defendant advances seven assignments of error challenging his conviction and sentence. After considering the oral and written arguments of the parties and the record evidence, we conclude that the defendant's conviction and sentence must be affirmed.

1. Facts
A seventy year old widow who lived alone was brutally murdered in her home at 1500 Jefferson Street in Gretna on October 23, 1981. The physical evidence indicated that she had been severely beaten, strangled and raped during a burglary. The assailant had broken in a window and ransacked the house. Whether any of her property had been taken could not be determined immediately, however.
The next day an anonymous tipster telephoned the Gretna Police Department and furnished information linking the defendant, James Flowers, with the murder. The unidentified caller asked for the police radio dispatcher by name but was told that he was on another call. Whereupon, the informant remarked that he didn't have time to wait and gave his information to another officer. According to the officer, the tip was to the effect that James Flowers, a black male, could be found in the area of Jefferson and Hamilton Streets driving a small white Chevette-type car containing one black male passenger and something taken from "that lady that was murdered on Jefferson Street yesterday". This message was given to the dispatcher who relayed it by radio to Officer Glen Michel, on patrol in the Jefferson Street area.
Officer Michel testified that he was advised by police radio to go to the 1500 block of Jefferson Street to look for a small white vehicle, possibly a Chevette or Mercury, driven by a Negro male by the name of James Flowers, who was suspected of having evidence taken during a burglary-murder which occurred the previous day at 1500 Jefferson. At this time, Michel was driving along Madison Street, parallel with Jefferson Street, one block from the murder scene. He was approaching the intersection of Madison and Cook Streets, and was *711 about one third of a block from the corner. Ten seconds later a black male driving a white Mercury came off Jefferson Street, turned onto Cook Street, then turned onto Madison Street ahead of Michel and came to a stop in the next block in which Madison comes to a dead end. Michel pulled through the intersection and up behind the vehicle, activated his red bar light, walked up to the white Mercury and asked the driver for his operator's license. Upon looking in the window, however, the officer saw some hand rolled marijuana cigarettes in an ashtray by the driver's right leg. He asked the occupant to exit the vehicle and seized the cigarettes, along with four or five "dime bags" of marijuana and some costume jewelry on the floor. The officer ran a computer check on the defendant's driver's license and verified that he was James Flowers.
Although the record does not reflect that Flowers was formally advised that he was under arrest at the scene, it is clear that he effectively was arrested and taken into custody when the officer saw the marijuana and asked him to get out of the car. Following this arrest, Flowers was escorted to the Gretna Police Complex and searched by Officer Michel. The officer discovered a knife and charged the defendant, a convicted felon, with possession of a concealed weapon in violation of La.R.S. 14:95.1. The defendant and all of the seized items were then delivered to Detective Dunn, the officer in charge of the murder investigation.
Detective Dunn showed the jewelry seized by Officer Michel and a necklace which Dunn removed from around the defendant's neck to members of the victim's family. The jewelry was positively identified as property of the victim. The defendant was informed that he was under investigation for aggravated burglary and first degree murder and verbally advised of his constitutional rights. The defendant waived his rights and gave a verbal statement in which he implicated himself in the burglary but contended that a confederate had entered the house and committed the murder.
Approximately five hours later, the defendant was placed under arrest for aggravated burglary, first degree murder and receiving stolen property and was again advised of his rights. Flowers, a twenty year old with an eleventh grade education, then signed a standardized waiver-of-rights form and was interrogated by Detective Dunn. The detective typed out his questions and the defendant's responses thereto. Flowers stated that he never entered the victim's home and that his participation in the crime was limited to helping the sixteen year old codefendant gain entrance into the home. The victim's screams caused the two defendants to seek shelter along a nearby railroad track, where approximately eighty dollars was divided. Flowers told Detective Dunn that he and his confederate then parted company with Flowers returning to his home as the codefendant returned to the victim's house. Within thirty minutes the two were reunited along the railroad tracks and at this point, according to Flowers' statement, the jewelry which Officer Michel seized was given to Flowers for safe-keeping.

2. Investigatory Stop
Prior to trial defendant moved to suppress his inculpatory statements and the evidence seized from the automobile and his person, claiming that they were fruits of an illegal arrest made without probable cause. After an evidentiary hearing, the district court denied the motion to suppress without assigning reasons. The defendant reurges as an assignment of error the issues raised by the motion to suppress.
Probable cause for arrest did not exist at the time Officer Michel approached the defendant's car, but probable cause for arrest did exist once the officer sighted the marijuana cigarettes in Flowers' possession. Although the defendant argues briefly against the existence of probable cause at any time, we reject his contention because the officer testified without dispute that he immediately recognized the handrolls as marijuana cigarettes based on his experience of having made approximately 2000 arrests for possession of marijuana. The *712 only genuine issue raised by defendant's assignment is whether the officer's actions preceding the arrest for possession of marijuana constituted a valid investigatory stop. If the pre-arrest detention was a valid investigatory stop, the officer was not guilty of making an unlawful intrusion before he sighted the marijuana in defendant's possession. Upon sighting the illegal drugs, he would have had probable cause to arrest the defendant and seize the evidence as an incident to a valid arrest untainted by any previous unlawful intrusion.
The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct. 1868, 1877-1878, 20 L.Ed.2d 889 (1968). Stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person, Terry v. Ohio, supra 392 U.S. at 16, 88 S.Ct. at 1877, and the Fourth Amendment requires that the seizure be "reasonable." United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). Because of the limited nature of seizures less intrusive than a traditional arrest, however, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest. Instead, the conduct involved must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. Terry v. Ohio, supra 392 U.S. at 21, 88 S.Ct. at 1879; Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); United States v. Brignoni-Ponce, 422 U.S. at 880-882, 95 S.Ct. at 2579-2580.
In order to assess the reasonableness of such official conduct as a general proposition, it is necessary first to focus on the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest of the private citizen, for there is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizures entails. Terry v. Ohio, supra 392 U.S. at 20, 88 S.Ct. at 1879; Camara v. Municipal Court, 387 U.S. 523, 534-535, 87 S.Ct. 1727, 1733-1734, 18 L.Ed.2d 930 (1967). And in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion. United States v. Brignoni-Ponce, supra 422 U.S. at 884, 95 S.Ct. at 2581. The conduct of those charged with enforcing the laws is subject to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment, the facts must be judged by an objective standard: would the facts available to the officer at the moment of seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result which the United States Supreme Court has consistently refused to sanction. United States v. Cortez, supra 449 U.S. at 417-418, 101 S.Ct. at 694-695. And simple good faith on the part of the arresting officer is not enough. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate and the people would be secure in their persons, houses, papers and effects only in the discretion of the police. Terry v. Ohio, supra; Beck v. Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 228-229, 13 L.Ed.2d 142 (1964).
Thus, there are at least three inquiries involved in determining whether a *713 seizure was a valid investigatory stop: (a) whether the intrusion was an arrest or a stop; (b) whether the stop was of a type which is reasonable in view of the public interest served and the degree of invasion entailed; and (c) whether the particular stop was warranted by a reasonable suspicion based on specific, articulable facts and rational inferences from those facts. In the present case, this last inquiry involves the question of whether the anonymous tip was corroborated and supplemented by the officer's observations sufficiently to provide a reliable source of such specific, articulable facts and inferences.[1]

a. Whether There Was An Arrest Or A Stop.
The distinction between an arrest and a stop is crucial in many cases, for an arrest can be made only on probable cause, while a stop is proper under the more relaxed "reasonable suspicion" standards of Terry. It is possible only to sketch some of the main features that demarcate the two types of intrusions. In Dunaway v. New York, 442 U.S. 200,92 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the high court found a stop for questioning indistinguishable from a traditional arrest because the suspect was not questioned briefly where he was, was transported to the police station, was never informed he was free to go and, in fact, would have been restrained had he tried to leave. Among the circumstances other courts have considered important to classifying the intrusion as either an arrest or a stop are: the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; the extent of the search, if any, made; and the amount of force, if any, used to make the stop. See, e.g., U.S. v. White, 648 F.2d 29, 34 (D.C.Cir.1981).
Reviewing the facts of the present case in light of these considerations, we conclude that Flowers was subjected to an investigatory stop, not an arrest, before he was removed from the automobile and arrested for possession of marijuana. The officer used no weapon or physical force to restrain the defendant, but merely turned on his bar light and asked to see his driver's license police conduct which does not normally signify or inevitably lead to an arrest. The officer did not perform a weapons search or even ask the defendant to leave the automobile before sighting the marijuana. There is no indication that the officer intended to do anything other than identify the defendant and briefly question him where he was.[2] Nor does the record suggest that a refusal to answer questions or an attempt to leave would have led to restraint or prolonged detention. On the contrary, prior to his arrest for possession of *714 marijuana, the defendant was subjected to only a very brief detention without a search during which he was asked only for his operator's license.

b. Whether the Stop was of a Reasonable Type
Applying the precepts set forth above to this case, we consider first the nature and extent of the governmental interests involved. It is obvious that the public interest demands effective measures to prevent and investigate the types of violent crimes suffered by the victim in this case. The offenses involved here were not violations of mere sumptuary laws but some of the most bestial and antisocial of all crimes. Moreover, there often is no practicable alternative available to officers investigating such crimes except to insist on an encounter with the suspect. Failure to identify suspicious persons in the vicinity of a recently committed violent crime may mean the loss of the only opportunity for bringing the offender to justice.
Against this valid public interest we must weigh the interference with individual liberty that results from a brief stop for questioning. The intrusion is modest. A person stopped under such circumstances is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation. See Terry v. Ohio, 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring.) A brief stop of a suspicious individual, in order to determine his identity or to ask him to explain suspicious circumstances, may be most reasonable in light of the facts known to the officer at the time. Adams v. Williams, 407 U.S. 143,146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).
Because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives, we conclude that when an officer's observations, together with a substantially corroborated tip, lead him reasonably to suspect that a particular vehicle may contain evidence of a recent violent crime, he may stop the car briefly and investigate the circumstances that provoke suspicion. See Delaware v. Prouse, supra 440 U.S. at 654, 99 S.Ct. at 1396; United States v. Brignoni-Ponce, supra 422 U.S. at 881, 95 S.Ct. at 2580.

c. Whether the Particular Stop was Warranted
The United States Supreme Court has recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest or to search for contraband or evidence of crime. United States v. Brignoni-Ponce, supra at 881, 95 S.Ct. at 2580; Adams v. Williams, supra 407 U.S. at 145, 92 S.Ct. at 1922; Terry v. Ohio, supra. Nevertheless, the Fourth Amendment requires that the detaining officer have knowledge of specific, articulable facts which, taken together with rational inferences from those facts, reasonably warrant the "stop" or "seizure." United States v. Cortez, supra; United States v. Brignoni-Ponce, supra; Terry v. Ohio, supra 392 U.S. at 21, 88 S.Ct. at 1879;State v. Brown, 370 So.2d 547 (La.1979).
An officer's knowledge of facts need not be based on his personal observations. On the contrary, an officer can, and in many situations must, act upon information supplied by another person, be it a fellow officer or an informant. This court and the United States Supreme Court have recognized that an informant's tip can provide a police officer with reasonable cause to detain and question a suspect. Adams v. Williams, supra; State v. Wilson, 366 So.2d 1328 (La.1978); State v. Sims, 350 So.2d 1189 (La.1977). Informant's tips may vary greatly, however, in their value and reliability. One simple rule, or test for "reasonableness," will not cover every situation. Adams v. Williams, supra 407 U.S. at 147, 92 S.Ct. at 1923.
When the state asserts the reasonableness of an investigatory stop made *715 in response to an informant's tip the reliability of both the informant and his information must be satisfactorily demonstrated, or, if the tip is inadequate under this standard, it may be deemed sufficiently trustworthy on the basis of corroboration by independent sources. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584,21 L.Ed.2d 637 (1969);State v. Brown, supra at 551; State v. Richards, 357 So.2d 1128 (La.1978). This standard must be maintained as a seizure based upon an unverified or undifferentiated tip derived from an undisclosed source would be unreasonable and, consequently, unconstitutional. State v. Wilson, 366 So.2d 1328 (La.1978).
The tip in the instant case involved a detailed and particularized description of a single individual. Defendant was described as a black male by the name of James Flowers, who would be driving a white Chevette or Mercury in the 1500 block of Jefferson Street. Additionally, the informant indicated that defendant had in his possession items taken during the burglary-murder committed at that address on the previous day.
The informant's familiarity with both the murder at 1500 Jefferson and James Flowers' plans to visit that area significantly reduced the chances that this information was unreliable. Although a tipster could easily link Flowers with a crime based purely on rumor, it would appear unlikely that he could so accurately predict Flowers' actions without personal knowledge of his affairs. Remoter still was the possibility that a clever enemy of an innocent James Flowers would bring about his encounter with police near a murder scene merely to inconvenience him. Once Flowers appeared in the white Mercury and stopped his car about a block from 1500 Jefferson, the possibility that the informant's story was truthful and reliable became substantial and much more likely than any other hypothesis.
In this particular case there is very little chance that the tip could have been fabricated after the stop. The informant's tip was handled by two officers, with one of them making a written record of the call and the informant's statements, as the other, the dispatcher, placed a radio call into the field. Two additional officers testified that they heard the tip relayed by radio to Officer Michel.
Consequently, because of the substantial corroboration of the tip and the peculiar circumstances involved before the encounter occurred, the risks usually associated with the use of an anonymous tip, i.e., lack of informant credibility or basis of knowledge and police fabrication, were substantially reduced. See generally LaFave, supra, § 9.3. Accordingly, we conclude that the information was sufficiently reliable and afforded the officer specific, articulable facts which, taken together with rational inferences, justified the temporary stop of defendant for questioning.
The motion to suppress was correctly denied and the assignment of error based on this ruling is without merit.
The remaining issues relate to the penalty phase of the bifurcated trial.

3. Failure to Define Mitigation
In his first assignment of error the defendant contends that the trial judge committed reversible error as he violated defendant's constitutional rights through his failure to explain clearly what statutory mitigating circumstances are and their function in the jury's sentencing deliberations. La.C.Cr.P. art. 905.5. The thrust of the defense's argument is that the phrase "mitigating circumstances" is a term of art which should have been defined by the judge. Counsel argues that the judge should have advised the jury that "mitigating circumstances" are "circumstances which do not justify or excuse an offense, but which, in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability and punishment," citing Spivey v. Zant, 661 F.2d 464, 471, n. 8 (5th Cir.1981).
The federal cases to which counsel for defendant has directed our attention do not require that the jury be given definitions of the concept of "mitigating circumstances." *716 The jury must receive clear instructions which not only do not preclude consideration of mitigating factors, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), but which inform the jury of its duty and authority to consider the qualities and characteristics of the individual offender and the circumstances of the particular offense. Spivey v. Zant, supra.
We find that the trial judge clearly and concisely instructed the jury on mitigation and its authority to recommend against death. The judge read Code of Criminal Procedure article 905.5 to the jury, emphasized to the jury its authority to consider any other relevant circumstances, and handed the jury a copy of the lists of aggravating and mitigating circumstances. Any further attempt to define or expand upon statutory mitigating circumstances may only lead to juror confusion and further efforts to define the definitions. Compare, e.g., State v. McDaniel, 410 So.2d 754 (La. 1982) (noting the traps for an unwary trial court attempting to define "reasonable doubt.") Based on the instructions given, the jury could properly exercise its role as finder of fact.
This argument appears to lack merit.

4. Weighing the Circumstances
In assignment number two the defendant argues that the trial judge failed to instruct the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances prior to recommending the death sentence and, therefore, committed error.
This court has recently considered and rejected this argument. State v. Welcome, ___ So. 2d ___ (La.1983), No. 82-KA-2232. The law of this state, La.C.Cr.P. art. 905.3 requires that the jury find unanimously and beyond a reasonable doubt the existence of at least one statutorily defined "aggravating circumstance." Having found a statutory aggravating circumstance, the jury is required to consider evidence of any mitigating circumstances, and to weigh it against the statutory aggravating circumstance so found, before recommending that the sentence of death be imposed. State v. Willie, 410 So.2d 1019, 1033 (La.1982). Our statute is modeled upon the one approved by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
This assignment has no merit.
5. Irrelevant Aggravating Circumstances
By this assignment of error, the defendant argues that the trial judge committed reversible error at the sentencing phase when he instructed the jury on aggravating circumstances under La.C.Cr.P. art. 905.4 that had no possible evidentiary basis in the record.
In his instructions to the jury the trial judge read the lists of aggravating and mitigating circumstances, C.Cr.P. arts. 905.4 and 905.5 and then stated:
The fact that you are given a list of aggravating circumstances should not cause you to infer that the Court believed that any of the circumstances do or do not exist.
The law requires that the jury be given such a list in every case.
Whether any aggravating or mitigating circumstances exists is a fact for you to determine based upon the evidence presented.
In addition to the evidence presented at this sentence hearingsentencing hearing in deciding the sentence to be imposed you may consider evidence presented during the guilt determination of the trial.
Defense counsel contends that when the trial judge instructed the jury on the admittedly extraneous aggravating circumstances, i.e. that the victim was a fireman or peace officer, the defendant was a hired killer, the defendant was imprisoned at the time of the murder, or that the victim was a correctional officer or an employee of the Louisiana Department of Corrections, he failed to properly guide and focus the jury's deliberations as is required by the Eighth and Fourteenth Amendments. See Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
*717 We can find no reversible merit in counsel's argument. The court clearly instructed the jury that it must review the evidence before it and determine which, if any, of the aggravating circumstances was proven beyond a reasonable doubt to exist. The trial judge did not tell the jury to disregard the aggravating circumstances which obviously could not be found to exist, but such instructions are implicit in the ones given. Furthermore, we cannot accept counsel's argument as it suggests that a judge, with the aid of counsel, should review the nine aggravating circumstances and instruct the jury only as to the ones supported by the evidence at trial. While such a procedure is permissible and desirable, it is not required constitutionally or statutorily.
This assignment has no merit.

6. Double Jeopardy
By assignment of error No. 4, the defendant argues that our capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, constitutes a denial of the guarantee against double jeopardy. The double jeopardy clauses embrace three separate rules prohibiting (1) reprosecution for the same offense following acquittal, (2) reprosecution for the same offense following conviction, and (3) multiple punishment for the same offense. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); State v. Chaisson, 425 So.2d 745 (La.1983). The capital punishment system does not permit or promote a violation of any of these rules and therefore does not violate the double jeopardy clauses. Moreover, the essence of the defendant's attack, although articulated differently, has been considered and rejected by this court before. See State v. Knighton, 436 So.2d 1141, (La.1983) (aggravating circumstances consist only of the elements of the crime); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981).

7. Appellate Review of Sentencing
Through these assignments of error the defendant contends that Louisiana's system of appellate review to insure evenhanded disposition of cases imposing the death penalty is constitutionally flawed in not mandating statewide review of the sentence imposed in similar cases. This court previously considered the question and a majority decided that proportionality review of death sentences within a judicial district, rather than on a statewide basis, passes constitutional muster. State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). See also Williams v. Maggio, 679 F.2d 381 (5th Cir.1982); Baldwin v. Blackburn, 653 F.2d 942 (5th Cir.1981).

Capital Sentence Review
Every sentence of death imposed in this state is reviewed by this court to determine if it is constitutionally excessive. In making this examination, the court determines whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors, whether the evidence supports the jury's findings of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.C.Cr.P. art. 905.9.
A. Aggravating Circumstances
As noted above, in discussion of assignment number four, the jury found and listed five aggravating circumstances. La.C.Cr.P. art. 905.4 and 905.7. We have reviewed the record with respect to three of the aggravating circumstances and conclude that the evidence is sufficient to support a reasonable jury's findings beyond a reasonable doubt of these aggravating circumstances.
The jury found that the offender was engaged in the perpetration of aggravated rape. La.C.Cr.P. art. 905.4(a). Aggravated rape includes nonconsensual anal or vaginal sexual intercourse committed where the victim resists the act to the utmost, but is *718 overcome by force, or where the victim is prevented from resisting the act by threat of great and immediate bodily harm. La. R.S. 14:42. The record supports a finding beyond a reasonable doubt that James Flowers had sexual intercourse with the victim, a seventy year old widow, and that the victim did not give her lawful consent. The evidence before this court, which included photographs of the victim's bruised and bloodied body and the autopsy report which indicates that the victim died of a brain hemorrhage, supports the jury's conclusion that the victim resisted the act to the utmost or was prevented from resisting by Flower's threats of great and immediate bodily harm.
The jury found that the offender was engaged in the perpetration of aggravated burglary. La.C.Cr.P. art. 905.4(a). Aggravated burglary includes the unauthorized entering of a structure where a person is present, with the intent to commit a felony or a theft therein, when the offender commits a battery upon any person while in such place. La.R.S. 14:60. The evidence before the jury clearly establishes that James Flowers unauthorizedly entered the victim's home with the intent to commit a theft. The evidence further establishes that he battered the seventy year old woman while he was inside of her home. The evidence, therefore, clearly supports the jury's finding of the aggravated burglary aggravating factor beyond a reasonable doubt.
The jury found that the offense was committed in an especially heinous, atrocious or cruel manner. La.C.Cr.P. art. 905.4(g). This court has held that in order for the jury to conclude that the offense was committed under this aggravating circumstance there must exist evidence, from which the jury could find beyond a reasonable doubt, that there was torture or the pitiless infliction of unnecessary pain on the victim. State v. Sonnier, 402 So.2d 650 (La.1981). Madeline Malmstron, the seventy year old victim, was severely beaten about the head and face, strangled and raped. Patterned abrasions and bruises on her neck were later matched up to the patterns in the soles of the defendant's tennis shoes. The victim's jaw was broken, several teeth were knocked loose, and she suffered at least three broken ribs. Serious physical abuse of the victim before death, such as that which this victim suffered constitutes torture. The jury's finding that the homicide was committed is an especially heinous, atrocious or cruel manner is supported by the evidence.
This court has taken the position that where more than one statutory aggravating circumstance is found by the jury, the state's failure to prove the other aggravating circumstances found by the jury does not invalidate the aggravating circumstances determined and the sentence of death based thereon. State v. Antonio James, 431 So.2d 399 (La.1983). Consequently, it is not necessary for us to consider whether the evidence supports the jury's other findings of statutory aggravating circumstances. State v. Mattheson, 407 So.2d 1150 (La. 1981).
B. Passion, Prejudice or Arbitrariness
Although the defendant is a black man and the victim was a white female, the record is devoid of any evidence that racial prejudice was a factor in the imposition of the death penalty. Our review of the record and of applicable law convinces us that this death penalty was not imposed arbitrarily or without reason or out of local passion.
C. Proportionality of Sentence
The final focus of this Court's sentence review in a capital case is a determination of whether the sentence in the instant case is disproportionate to the penalty imposed in similar cases in the same parish. Both the crime and the defendant must be considered.
Pursuant to Supreme Court Rule 28 § 4, the state filed a sentence review memorandum which listed the twenty-two first degree murder cases in the Twenty-Fourth Judicial District in which sentence was imposed *719 after January 1, 1976. The death penalty was imposed in six of these cases.
A comparison of the sentence in this case to sentences in other first degree murder prosecutions shows that it is not a disproportionate sentence. The instant offense was committed without provocation and in a particularly brutal manner in that the defendant beat his victim, breaking her jaw and several ribs, and raped her before killing her. Juries in the Twenty-Fourth Judicial District have recommended the death penalty in other cases involving crimes committed in such a senseless, brutal fashion as the instant murder was committed.[3]

DECREE
For these reasons the defendant's conviction and sentence of death are affirmed.
AFFIRMED.
MARCUS, J., concurs.
BLANCHE, J., concurs and will assign reasons.
NOTES
[1] We are guided in this three part analysis by a number of decisions wherein the reviewing court emphasized that the detached, neutral judicial scrutiny to which police conduct is subjected involves the traditional inquiries, i.e. what is the nature of the intrusion (was it a stop or an arrest) and what were the objective facts upon which the law enforcement officer relied, as well as an examination of the governmental, or public, interest to be served. See United States v. Brignoni-Ponce, 422 U.S. at 881, 95 S.Ct. at 2580; United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J. concurring); United States v. White, 648 F.2d 29 (D.C.Cir.1981). An implicit consideration is, therefore, the seriousness of the criminal conduct under investigation. The governmental or public interest in the prevention of serious or violent crimes, and the quick apprehension of those who commit this type of offense is generally stronger than that which exists when an individual commits, or is suspected of having committed, a nonviolent or possessory offense. This heightened public interest in the case of serious or violent crimes can tip the scales in favor of the reasonableness of the police conduct. United States v. Soyka, 394 F.2d 443 (2nd Cir.1968); United States v. Kancso, 252 F.2d 220 (2nd Cir. 1958); See also, LaFave, Search and SeizureA Treatise on the Fourth Amendment, § 3.2 (1978).
[2] Officer Michel testified that he stopped the White Mercury Cougar "to see if the driver was named James Flowers." As in White, 648 F.2d at 34, where the officers stopped the defendant's car to "further his investigation," this case involves an officer who initially intended to question, not arrest, the appellant. In both instances visual inspection of the automobile revealed narcotics which in turn gave the officer probable cause to make the arrest.
[3] State v. Sawyer, 422 So.2d 95 (La.1982); State v. Taylor, So.2d 109 (La.1982); State v. Robinson, 421 So.2d 229 (La.1982).