758 So.2d 972 (2000)
STATE of Louisiana, Appellee,
v.
David Carl THOMPSON, Appellant.
No. 33,058-KA.
Court of Appeal of Louisiana, Second Circuit.
April 7, 2000.
*975 Peggy J. Sullivan, Louisiana Appellate Project, David Carl Thompson, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal and Traci Ann Moore, Assistant District Attorneys, Counsel for Appellee.
Before NORRIS, C.J., and STEWART and CARAWAY, JJ.
NORRIS, Chief Judge.
Following a jury trial, the defendant, David Carl Thompson, was convicted of second-degree murder and received the mandatory sentence of life imprisonment without benefit of probation, parole, or suspension of sentence. Thompson challenges the sufficiency of the evidence, the admission of four incriminating statements made to the police, and the admission of certain photographs of the victim at trial. For the reasons expressed below, we affirm.

Factual Background
The victim, Carl Ivey, and his friend, Michael Redding, went fishing on Cross Lake on the evening of September 6, 1996. They met at approximately 5:30 p.m. and fished for two to three hours. Since they had plans to go fishing again the following morning, Redding left three rod and reels and a shiner bucket in the victim's car. Redding never saw Ivey again after he left his house that Friday night.
The next morning, September 7, 1996 at 11:00 a.m., patrol officers of the Shreveport Police Department reported to an alley located near the corner of Southern Avenue and 63rd Street of Shreveport. The officers discovered a large amount of blood, a bloody socket wrench, a matchbook, and a plastic bag in the alley. Shortly thereafter, the Crime Scene Investigations Unit recovered these items and documented the scene with photographs and diagrams. A subsequent fingerprint examination of the socket wrench revealed no prints due to its rough surface.
Later that same evening, Officer Theresa Bell of the Shreveport Police Department returned to the alley in response to a call from Noah and Peggy Reed at 6302 Southern Avenue, a property adjacent to the alley. Noah gave Bell a butcher knife which he claimed to have found in the grass. That morning Noah, who is Thompson's cousin, was preparing to cut the knee-high grass when he found the wooden-handled knife approximately 20 feet from where the blood was found earlier that day. Peggy gave Bell a wallet which she also found in the yard. The wallet contained the identification of the victim, Carl Ivey, and a pawn ticket with Ivey's name on it. Bell tagged these items and placed them into evidence.
On the previous night, the Reeds had gone to the Pinstripe Lounge and saw Thompson and Thadius Webb leaving the lounge between 9:30 and 10:30 p.m. with a sandy blonde-haired man who was wearing shorts and a long baseball style shirt. Reed later testified that a picture of the victim resembled the man that he saw leave the lounge with the defendant and Webb. Noah also testified that when he first arrived, Thompson appeared to be "pretty well lit" and that he saw Thompson consume two to four additional drinks while Reed was there.
Reed later saw Thompson at 6:00 a.m. when the defendant came to his apartment and told him that he was running from the law. Reed testified that Thompson brought him some fishing poles which his wife later pawned. These fishing poles were subsequently recovered by police and identified at trial as the ones Redding left in the victim's car the night before the murder.
*976 Joyce Mauldin Pagel, Thompson's cousin, testified that on the morning of September 7, 1996, Thompson telephoned her and asked her to pick him up at her mother's house located at 6306 Southern Avenue. Pagel picked him up and took him to her home in Keithville.
Pagel testified that Thompson told her that on the previous night he had held a man while Webb stabbed him. Thompson initially told her that he and Webb put the man in a car and left him there but then told her that he and Webb had dropped the body off on Wallace Lake Road by a driveway in a densely wooded area. He further told Pagel that this incident had taken place behind her father's (Amos "Mickey" Desadier's) house located at 6302 Southern Avenue.
Initially disbelieving Thompson, Pagel went to her father's house and discovered a large amount of blood in the alley behind the house. She was present when the Reeds discovered the knife and wallet in the grass. When Pagel returned to her home to find that Thompson was still there, she told him to leave. Thompson then fled to Natchitoches.
Donald Ivey, the victim's cousin, became concerned when he learned that Carl had not reported for work. He then reported him missing and began searching for him. On September 9, 1996, he found Carl's car parked behind Connie's Hideaway Lounge on Greenwood Road and immediately notified the police.
Lieutenant David Crawford of the Shreveport Police Department responded to Donald's call and found blood both on the exterior and in the interior of the vehicle. Crawford was unable to recover any fingerprints from the exterior of the car and it was taken to the North Louisiana Crime Lab. Robert Wilcox, the manager of the Palomar Motel which is located behind Connie's Hideaway and is part of the same property, stated to police that Ivey's car was parked in the lot since the early morning of September 7 in the spot assigned to either room 33 or 44. A guest at the hotel who occupied the room adjacent to Thompson's stated that she saw a white male with blood on his shirt returning to the room in the early hours of September 7.
Wilcox, who maintained the guest records of the motel, stated to police and also testified later at trial in order to check into the motel, guests had to produce either a driver's license or a state-issued ID. It was Wilcox's practice to use the ID to fill out a registration card which contained the name, address, driver's license number, and date of birth of the guest.
At trial, Wilcox identified a registration card which indicated that David Thompson checked into room number 33. Although the card does not contain a date, the ticket receipt stapled to the card was dated September 6, 1996, indicating when the guest checked into the hotel and paid his fee.
The police, who were at this time seeking to question Thompson, contacted Pagel on September 9, 1996 after learning from her father that she had picked up Thompson on the morning of September 7. Pagel subsequently located Thompson at her grandmother's home in Natchitoches and informed the police of his location.
Pagel volunteered her assistance in returning Thompson to Shreveport when he expressed a desire to surrender to the police. She picked up Thompson at her grandmother's house in Natchitoches. En route to Shreveport, Thompson asked her to stop at a convenience store outside the city limits to use the restroom. When she stopped the car, Thompson noticed an unmarked SPD vehicle pulling up behind them. He then exited the car and surrendered himself to the police.
Acting on information provided by Thompson in an oral statement while returning to Shreveport, police located Ivey's body near Wallace Lake Road in a wooded area. Several driveways were located along the roadway. According to Officer Amy Chrietzberg of the SPD Crime Scene *977 Investigation Unit, who processed the crime scene, the body could not be seen from the driveway or the road unless someone was looking for it. The body was in a state of decomposition, bloated, and ridden with insects. The deceased was subsequently identified by his fingerprints as Carl Ivey. The only other evidence recovered was a comforter.
Later that same evening, Detectives Michael Kellum and Eatman formally interviewed Thompson at the police station after he indicated that he wished to make a statement. Thompson made additional statements to the detectives on September 11 and September 25, 1996. In each case, Thompson was read his Miranda rights, which he waived, and the statements were recorded. Thompson did not testify at trial, and the September 10 and 11 statements were played to the jury.
In his statements to the police, Thompson stated that after he got off work on September 6, 1996, he went to his uncle's home at 6302 Southern Avenue. He later left with Chris Owens and Richard Owens for the Palomar Motel to rent a room for the night. He rented room number 33 and then went straight to Connie's Hideaway Lounge located in the motel parking lot. Later that night, Thompson met Webb and Ivey at the Pinstripe lounge. Thompson was under the impression that Webb and Ivey knew each other prior to meeting at the Pinstripe.
Thompson, Webb, and Ivey then left the Pinstripe and went to a downtown bar where they drank for some time. Webb and Ivey then dropped Thompson off at Connie's Hideaway because they were going to Cedar Grove to purchase drugs.
Later, Webb called Thompson at the lounge and told him that he and Thompson's uncle, Amos Desadier, had been robbed and beaten. According to Thompson, when he arrived at Desadier's house with Chris Owens,[1] Webb and Desadier were fighting with two black men. Thompson claimed that he also became involved in the altercation and hit one of the men with a tool. At some time after the altercation ended, Ivey pulled into the alley.
According to Thompson, at that point, Webb accused Ivey of setting him up to be robbed, claiming that Ivey took him to a house to buy drugs, and while he was in the car outside the house he was robbed at gunpoint. Webb and Ivey began to fight. When it seemed that Ivey was prevailing, Thompson admitted that he grabbed Ivey and slammed him against the car. Webb then stabbed or hit Ivey in the face numerous times with a butterfly knife while Thompson held him. Thompson, however, did not realize that Webb had stabbed Ivey until blood was all over him. This made Thompson sick so he went to vomit in the grass. When Thompson returned, Webb had a butcher knife and Owens and Webb were kicking and/or punching the victim while he was on his hands and knees. Thompson did not think that Webb ever cut Ivey with the butcher knife. He then went inside his uncle's house to clean the blood off.
In his September 10 statement, Thompson admitted that he had hit a black man with a tool similar to a wrench in the earlier altercation, but denied hitting Ivey with the wrench; in fact, Thompson claimed that he did not know if the victim was ever hit with a wrench. In his September 11 statement, however, Thompson gave a differing view of events, admitting he struck Ivey in the head with the wrench when he realized that Ivey was winning the fight with Webb. He admitted that he had hit the victim with the ratchet approximately two times with the first blow to Ivey's head. After he struck Ivey, Thompson claimed that Ivey was still "almost standing." He further stated that Chris *978 Owens also hit Ivey with a long object that could have been a wrench or a pipe.
After Ivey fell, he laid by the car as both Webb and Owens kicked him. Thompson did not become involved at that point he said, they were "whipping [the victim] pretty good." Webb then began to slap the victim and "stuff" with the butcher knife. Thompson told Webb to "come on" and tried to take the butcher knife away from him. Thompson eventually took the knife and threw it in the bushes.
Thompson then went to Desadier's house to clean the blood off of himself. At this point, he told his uncle that Webb had stabbed a man. Thompson then went to Noah Reed's house at 6404 Southern Avenue and told him that he was running from the law because Webb had cut a man around the neck and face area while he was holding him and the man fell down. Desadier and Reed corroborated these admissions in subsequent interviews with police and at trial.
When Thompson returned to the alley, Webb and Owens had already placed Ivey in the backseat of Ivey's car. While on the way to Wallace Lake Road, Owens was in the backseat of the car with the victim and kept hitting and/or stabbing him while telling him to be quiet; Thompson sat in the front passenger seat.
When they arrived at Wallace Lake Road, Owens pulled Ivey out of the car in a blanket. According to Thompson, Ivey kept saying that he could get Webb his money back, but he thought Webb and Owens were going to kill the victim because they kept kicking him. Webb, however, said that he was only going to tie the victim to a tree and leave him. Thompson did not see Ivey again after Webb and Owens dragged him into the woods in the blanket. According to Thompson, Ivey was still alive at the time.
Thompson explained that there was blood on the car tires because the altercation with the victim occurred next to the car. Thompson admitted that he did not attempt to help him. Further, he did not know where the blanket that the victim was wrapped in had come from.
After leaving Wallace Lake Road, Webb and Owens dropped Thompson off at the Pinstripe which was closed. Webb and Owens were supposed to pick the defendant up after they purchased drugs on the street behind the Pinstripe. Webb and Owens never returned, so Thompson returned to the hotel. Thompson was in his room when a man named Mike came and told him that Webb had sent him to tell Thompson that his "partner" was going to jail. Thompson then noticed that there were police in the parking lot of the motel and Ivey's car was in the parking lot near the lounge.
Thompson left the motel because he was scared that Webb was going to tell the police his room number, and walked to Noah Reed's house where he spent the night. Once there, he again told Reed what had happened. That morning, he called his cousin, Joyce, to pick him up. When Joyce told him to leave, Roy Jennings, a man who worked with Thompson, and a girl drove him to Natchitoches. Once there, he called his uncle, Charlie, who advised him to turn himself in to the police. Charlie told him that Webb had called him and admitted stabbing Ivey because Ivey had robbed him.
Dr. Steven Cogswell, the chief deputy coroner for Caddo Parish, was accepted as an expert in forensic pathology. Although Cogswell did not perform the autopsy on the victim, he did review the autopsy report. Based upon the report, Cogswell determined that the cause of death was blunt force injury to the head with contributory stab wounds or sharp force injury. Cogswell testified that the stab wounds were not defensive and that these injuries occurred before the death of the victim. Cogswell further testified that these wounds were not consistent with those received during a wrestling match because they were sharp force wounds and not abrasion wounds. In Cogswell's opinion, *979 these wounds were very shallow and not inflicted to cause death, but rather pain and bleeding; in addition, he was confident that the wounds on the upper right thigh were inflicted while the victim was standing still or being restrained because they were almost parallel, evenly spaced and relatively shallow.

Discussion Sufficiency of the Evidence
By his first two assignments of error, Thompson contends that the evidence adduced at trial was insufficient to convict him of second degree murder and that the trial court erred in denying his Motion for Post-Verdict Judgment of Acquittal because there was not sufficient evidence to prove beyond a reasonable doubt that he was guilty of second degree murder.
Thompson's Motion for Post-Verdict Judgment of Acquittal raises the question of legal sufficiency. La.C.Cr.P. art. 821; State v. Combs, 600 So.2d 751 (La.App. 2d Cir.), writ denied, 604 So.2d 973 (1992). When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, we review the sufficiency of the evidence claim first to determine whether the accused is entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). Under Hudson, supra, the accused may be entitled to an acquittal if the evidence does not satisfy the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992).
Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, 29,253 (La.App. 2d Cir. 4/2/97), 691 So.2d 347; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). Accordingly, our role is not to assess credibility or reweigh evidence. State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165; State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gradick, 29,231 (La.App.2d Cir. 1/22/97), 687 So.2d 1071; State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760.
Evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt. State v. Davies, 350 So.2d 586 (La.1977); State v. *980 Daniels, 614 So.2d 97 (La.App. 2d Cir.), writ denied, 619 So.2d 573 (1993).
Thompson contends that the evidence adduced during his trial shows that Webb and Owens actually killed the victim; thus, his conviction, which was based on the allegation that he was a principal to second degree murder is in error because the state failed to prove that he had the specific intent to kill Carl Ivey or inflict great bodily harm. Although he admits that he took part in the altercation with the victim, he denies that he had the specific intent to kill him; in fact, he denies that he knew that Webb was going to kill Ivey in the woods. As such, he contends that Ivey's murder was an act intended solely by Webb and occurred after he was no longer in the immediate presence of the victim when Webb and Owens dragged Ivey into the woods off Wallace Lake Road.
In support of his contentions, Thompson points out that Ivey was alive and talking coherently when he last saw him. Further, Thompson contends that there is no evidence in the record that he knew that Webb was going to kill the victim when they took him to Wallace Lake Road.
Second degree murder is defined, in pertinent part, as "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. A person may be convicted of an offense even if he has not committed the actual offense if he is found to be a principal. A principal is defined as:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
La. R.S. 14:24.
Only persons who knowingly participate in the planning or execution of a crime are principals. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427. Knowledge that a crime will be, or has been committed, is insufficient by itself to convict a person as a principal. State v. Cayton, 98-100 (La.App. 3d Cir.10/28/98), 721 So.2d 542. A person's mere presence at the scene of the crime is not enough to "concern" him in the commission of the offense. State v. Hebert, 29,062 (La. App.2d Cir.1/22/97), 688 So.2d 612, writ denied, 97-0497 (La.9/5/97), 700 So.2d 503. A person may only be convicted as a principal for a crime for which he personally has the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980).
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990), rehearing denied; State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993). Specific intent need not be proved as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.), writ denied, 544 So.2d 398 (La.1989).
Thus, in order to find the defendant guilty of second degree murder, the jury must have found that he specifically intended to kill Carl Ivey or inflict great bodily harm.
Through his own admissions in recorded statements made to SPD Detectives, Thompson implicated himself as a principal in Ivey's murder. In those statements, he admitted that he grabbed the victim, slung him out of his car, and "whammed" him against the car. In his September 11, 1996 statement, Thompson even admitted that he hit Ivey in the head with a ratchet. Thompson further admitted that he held Ivey while Webb stabbed or hit him in the face numerous times with the butterfly knife. He also admitted that he went with *981 Webb and Owens to dispose of the victim near Wallace Lake Road.
In addition to these recorded confessions to the police, Thompson also confessed to several witnesses, indicating that he was not merely present at the scene of the crime; rather, that he knowingly participated in inflicting great bodily harm to, and murdering Ivey. Noah Reed testified that on the night of the murder and the next day, Thompson told him that he was running from the law because Webb had stabbed a man while he held him. Similarly, Joyce Mauldin Pagel testified that Thompson told her that he had held a man while Webb stabbed him and that he and Webb dropped the victim's body off on Wallace Lake Road near a driveway in a densely wooded area. At no time did Thompson provide an explanation or offer evidence to suggest that his decision to stay and participate in the assault was anything except voluntary.
Viewing the evidence in the light most favorable to the prosecution, a rational juror could find that Thompson played an active role in the physical assault of the victim by hitting him with the wrench and holding him while Webb hit and stabbed him repeatedly as well as participating in the disposal of the victim's body. Consequentially, Thompson possessed the specific intent to kill or inflict great bodily harm required for a conviction of second degree murder. The testimony presented provides ample evidence from which the jury could conclude as much.
These assignments of error are without merit.

Motion to Suppress Statements Made to the SPD
By his third assignment of error, Thompson claims that the trial court erred when it denied his Motion to Suppress his oral statement made to SPD officers when he surrendered to them on September 10, 1996 as well as his subsequent recorded statements on September 10 and 11, 1996.[2]
The ruling of a trial court on a motion to suppress a confession is entitled to deference if it is supported by the evidence. State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179; State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367. In reviewing a motion to suppress, a reviewing court may consider the evidence adduced at the trial in addition to the evidence adduced at the motion to suppress hearing. State v. Fisher, supra; State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
Thompson contends that on September 10, 1996, when he surrendered to the SPD detectives, the police officers first made contact with him outside of their jurisdictional boundaries. As such, his arrest on September 10, 1996 was illegal and that any statements he made as a result of his illegal detention must be suppressed.
Initially, this court must determine whether Thompson had indeed been arrested when he surrendered to the officers outside Shreveport city limits. If this court determines he was under arrest, this court must determine if the arrest was based on probable cause. If this court determines that there was no probable cause to arrest the defendant, this court must determine if the statements were inadmissible as the fruit of the unlawful arrest.
The trial court concluded that the police officers were outside their jurisdictional limits when Thompson was taken into custody outside the Shreveport city limits. Although the officers testified, and Thompson admitted that he voluntarily surrendered to the officers at the convenience store because he was en route to Shreveport for that very purpose, he was placed into handcuffs, as per departmental policy, when he was placed in the unmarked police *982 vehicle. Because he was handcuffed, Thompson argues that at this time he was placed under arrest. For support, he cites State v. Raheem, 464 So.2d 293, 296 (La. 1985), which states that "[a]n arrest occurs when the circumstances indicate an intent to effect an extended restraint on the liberty of the accused, rather than at the precise time an officer tells an accused he is under arrest." Thompson also points to the fact that one of the officers testified that he would not have been free to leave and that the officers' supervisor testified that they were instructed to stop the vehicle inside the Shreveport city limits and arrest him.
La.C.Cr.P. art. 201 states, inter alia, that an "[a]rrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him." The test to determine whether a person had been arrested is objective; the issue is not resolved by either the person's subjective impression or the lack of formality of the arrest. State v. Fisher, supra; State v. Thibodeaux, 414 So.2d 366 (La.1982).
The totality of the circumstances determines whether an arrest occurred, but several factors distinguish an arrest from lesser infringements on personal liberty. State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713. One factor is whether, under the totality of the circumstances, a reasonable person would not consider himself free to leave. State v. Allen, supra. Another factor is whether the circumstances indicate a police intent to impose an extended restraint on the person's liberty. State v. Allen, supra; State v. Simms, 571 So.2d 145 (La.1990).
In the present case, upon his surrender outside of the Shreveport city limits, the police officers forcibly restrained the defendant by handcuffing him and placing him in the back of the police car. Although Thompson was allowed to enter the convenience store and use the restroom prior to being handcuffed, Detective Oster followed him to the restroom and waited outside the door. Once in the vehicle, Thompson was never left unattended in the police unit. Accordingly, a reasonable person in this position could not have believed that he was free to go, and indeed Thompson was not. Obviously, the officers intended to place Thompson under arrest as they were instructed by their supervisor to arrest him once they were within the city limits. This indicated an unmistakable intent to impose an extended restriction on the defendant's liberty. See State v. Fisher, supra.
Under the totality of the circumstances in the present case, we conclude that Thompson was under arrest when he was first taken into custody on September 10, 1996 outside Shreveport city limits. Having found that the officers arrested Thompson, we must next determine if the officers had probable cause to do so as private persons and not in their official capacity as police officers.
La.C.Cr.P. art. 214 states that "[a] private person may make an arrest when the person has committed a felony, whether in or out of his presence." This article authorizes private citizens and peace officers alike to make arrests for felonies not committed in their presence. State v. Jarvis, 97-1174 (La.App. 5th Cir.4/9/98), 710 So.2d 831, writ denied, 98-2219 (La.1/8/99), 734 So.2d 1222; State v. Washington, 444 So.2d 320 (La.App. 1st Cir.1983), writ denied, 445 So.2d 450 (La.1984). Thus, arrests made by officers acting only as private citizens when they effected the arrest are valid under Louisiana statutory law. Id.
Although conceding that police officers may make felony arrests as private persons outside their territorial jurisdiction, Thompson nevertheless argues that the requisite probable cause was lacking to make a warrantless arrest because at the *983 time he was arrested, the police were not certain that Carl Ivey had been murdered. In fact, Thompson argues, Ivey's body was not discovered until he brought the police to the location.
The state bears the burden of proving probable cause when a defendant seeks suppression of a confession obtained through an arrest allegedly made without probable cause. State v. Fisher, supra; State v. Tokman, 412 So.2d 561 (La.1982). Probable cause for arrest exists when the facts and circumstances known to the officer or of which he has reasonably trustworthy information, are sufficient to justify a man of ordinary caution in the belief that the person to be arrested had committed a crime. State v. Fisher, supra; State v. Thomas, 349 So.2d 270 (La.1977); State v. Gates, 24,995 (La.App.2d Cir.1/19/94), 630 So.2d 1345. The standard for determining probable cause is an objective one that must withstand the "detached, neutral scrutiny of a judge." State v. Flowers, 441 So.2d 707 (La.1983), cert. den., 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984).
It is not a prerequisite for the existence of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. While knowledge of the commission of a particular crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established. It is sufficient that it be reasonably probable that a crime has been committed under the totality of the known circumstances. State v. Simms, supra. While it arguably takes more and better evidence to provide probable cause when the police do not know a particular crime has been committed, probable cause is to be judged by the probabilities and practical considerations of everyday life on which average men, particularly average police officers, can be expected to act. State v. Drott, 412 So.2d 984 (La.1982). Of course, the setting or location is an important consideration. State v. Gates, supra.
Through their investigation, the detectives who arrested Thompson knew that: Carl Ivey had been reported missing by his family and had not shown up at work; there was a bloody scene in an alleyway in Cedar Grove; Ivey's wallet and a butcher knife was found in the grass nearby; Ivey's bloody car was located at the Palomar Motel on Greenwood Road; Thompson's cousin, Joyce Mauldin Pagel, reported that he told her that he held Ivey while Webb stabbed him and helped dispose of the body; a witness, Liz Madrigal, observed a white male smeared with blood exit Room No. 33 at the Palomar Motel; Room No. 33 at the Palomar Motel was registered to Thompson; Thompson's uncle, Amos "Mickey" Desadier, who lived at 6302 Southern Ave., reported that Thompson and Thadius Webb had severely beaten a person in the alleyway behind his residence and dumped his body near Wallace Lake; Noah Reed reported that Thompson told him on the night of the murder that he was running from the law because Webb had cut a man around the neck and face area while he was holding him and the man fell down; and that Thompson was enroute to Shreveport to surrender to police because he was a suspect in the events related to Ivey's disappearance. At a minimum, the officers knew, by virtue of Thompson's admissions to his family members, as well as the physical evidence, that a felony offense had been committed against Ivey's person and that Thompson was involved.
Under these circumstances, we conclude that although the precise nature of the crime was yet to be determined, the detectives, acting as private citizens, undeniably had probable cause to arrest Thompson for the commission of a violent crime against Ivey. Since probable cause existed for Thompson's arrest, the trial court correctly refused to suppress Thompson's statements as the fruit of an unlawful arrest.
*984 This assignment of error is without merit.
Thompson also contends that his statements should have been suppressed by the trial court because he was deprived of his seizure medication when they were made. The defendant argues that the absence of his medication could cause seizures, creating a great deal of emotional stress that vitiated his consent.
At the suppression hearing, Thompson testified that he was not given his seizure medication on September 10 and 11, 1996 and that both recorded statements were given at a time when he was being deprived of his medication. Thompson claimed that he would have seizures, loss of control of his hands, and bodily shakes when he missed his medication. He also testified, however, that to his knowledge, his ability to think had not been affected when he missed a dose of his medication and that he has had seizures even when he took his mediation as prescribed.
As such, the defense failed to demonstrate that Thompson's failure to take his medication affected his ability to waive his Miranda rights. Further, Thompson testified that he normally took his medication at 10:00 p.m. prior to going to sleep and that he had taken his medication on September 9, 1996. Thus, when Thompson gave his statement on September 10, 1996, at 9:25 p.m., he had not even missed a dose of his medication.
Moreover, the trial court, after listening to a majority of the recorded statements, determined that Thompson did not appear to be suffering from a medical condition when he gave the statements. The trial court further found that nothing in Thompson's medical reports demonstrated that his medical condition impaired his ability to knowingly and voluntarily waive his Miranda rights or vitiated his consent to make the statements. The evidence supports the trial court's ruling and therefore should not be disturbed absent manifest error, which is not present. State v. Jackson, supra.
This assignment of error is without merit.

Gruesome Photographs
By his final assignment of error, Thompson contends that the admission of two photographs of the victim at trial violated due process and the right to an impartial jury under the Louisiana and federal constitutions because of their alleged gruesome nature. Thompson also contends that the photos were inadmissable because the state did not comply with discovery. Although assigned as error, Thompson does not brief or argue this issue. Thus, this part of his assignment of error will be considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990).
Although Thompson does not specify which two photographs he challenges, from his argument, we infer that he is referring to S-13 and S-14. Both photographs were taken at the location where Ivey's body was discovered and depict the wounds to the victim's leg and knee area.
Thompson contends that the probative value of the photographs was slight and the prejudicial effect was high because the photographs depict stab wounds which Dr. Cogswell characterized as superficial and did not lead to Ivey's death. As such, Thompson argues that the state introduced these photographs not for any probative value, but to incite the jurors to return a conviction on the basis of their responses to these horrifying photographs. Thompson further contends that these photographs could unfairly suggest that Ivey was tortured, which was not even discussed by Dr. Cogswell. This inference of torture without any corroborating evidence, together with the gruesome photographs of fly and maggot-infested wounds, caused such prejudice that it far outweighed *985 the probative value of showing the location, severity and number of wounds.
In addition, Thompson argues that Dr. Cogswell's description of the wounds as superficial does not do justice to the photographs. Due to the swollen and bloated nature of the body, these superficial wounds were split further apart, which made them look far more severe than at the time of infliction.
Relevant evidence is evidence which has any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence. La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. The trial court's determination regarding the relevancy of evidence is entitled to great weight and should not be overturned absent a clear abuse of discretion. State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Jackson, 30,473 (La.App.2d Cir.5/13/98), 714 So.2d 87, writ denied 98-1778 (La.11/6/98), 727 So.2d 444; State v. Washington, 30,866 (La.App.2d Cir.8/19/98), 716 So.2d 936. Photographs are not admissible if they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Tolbert, 30,821 (La.App.2d Cir.8/19/98), 716 So.2d 949; State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).
The trial court has great discretion in admitting photographs into evidence. Absent an abuse of that discretion, the ruling will not be disturbed. State v. Perow, 616 So.2d 1336 (La.App. 2d Cir.), writ denied, 623 So.2d 1303 (1993); State v. Gay, 29,434 (La.App.2d Cir. 6/18/97), 697 So.2d 642; State v. Washington, supra.; State v. Craig, supra.
In this case, Ivey suffered multiple, nonfatal stab wounds to his head, face and legs. The state introduced two photographs (S-13 and S-14) that depicted lacerations to the victim's right leg and knee area. The photographs were taken four days after Thompson and his companions left Ivey lying in a wooded area.
Dr. Cogswell testified that the wounds to the victim's leg and knee area were shallow, sharp force wounds that were not inflicted to cause death, but rather pain and bleeding. Dr. Cogswell further testified that the wounds to the victim's leg were not defensive wounds and the wounds to the victim's knee area were probably not defensive wounds. According to Dr. Cogswell, the victim was either unconscious or restrained, but still alive, when the wounds to his leg and knee area were inflicted.
The photographs in question were relevant and necessary to establish the location, severity and number of wounds. The photographs were also relevant to establish the defendant's specific intent to kill or inflict great bodily harm. Moreover, although graphic, these photographs are not so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 559 (La.1986); see also, State v. Copeland, 530 So.2d 526, 542-543 (La.1988), cert. den., 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860, reh. den. 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (color picture of child's head partially blown away admitted). Thus, the probative value of the photographs substantially outweigh any prejudicial effect; the trial court did not err in admitting the photographs into evidence.
*986 This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, Thompson's conviction and sentence are affirmed.
NOTES
[1] Thompson's September 10 statement speaks of a man named "Jerry" as one of the participants in the events. In his September 11 statement, Thompson admitted that "Jerry" was in fact his friend Chris Owens.
[2] The trial court granted the motion as to the recorded statement made on September 25, 1996.